IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-cr-00332-RMR

UNITED STATES OF AMERICA,

      Plaintiff,

v.

LYNDELL DANIELS,

      Defendant.

_____

## MOTION TO SUPPRESS
_____

The defendant, Lyndell Daniels ("Mr. Daniels"), by and through undersigned counsel, David E. Johnson, hereby moves this Court to suppress all evidence (including statements and physical evidence) obtained as a result of his unlawful seizure on February 7, 2021.

On that date, police detained Mr. Daniels without reasonable suspicion. During and as a result of the unlawful detention, officers obtained statements from Mr. Daniels. Those statements should be suppressed. Further, months later, police used information gathered during their unlawful detention of Mr. Daniels to obtain a state court order authorizing collection of Mr. Daniels' DNA. The DNA collection should also be suppressed. In sum, Mr. Daniels seeks to suppress the information gathered during his unlawful detention and its fruits, including the results of the DNA analysis.

## FACTUAL BACKGROUND

**A. An apartment complex resident calls 911 to report that several Black men in dark clothing have guns.**

Late last Super Bowl Sunday, February 7, 2021, the Aurora Police Department (APD) received a 911 call. The caller, who indicated she wished to remain "anonymous", stated that her call was "not an emergency", but that several Black males were hanging out in her apartment complex parking lot near the building's entrance; they had guns. She explained that this wasn't an emergency—the men weren't committing any crimes, but seemed to be taking the guns from their pockets and posing, possibly 'trying to prepare for something' she opined without elaboration. The operator confirmed that her concern was that the men were intermittingly taking the guns from their pockets, nothing more.[1] *See generally* Exhibit A (recording of 911 call).

The caller said that the individuals were wearing hoodies. The dispatch operator explained that providing details on the individuals' clothing was important and asked if the caller could "differentiate" on the "pants" the individuals were wearing, specifically asking for the color of pants. The caller thus described the men's clothing in detail: one was wearing a black hoodie with black jeans, another also was wearing a black hoodie and black jeans, and the last she described as wearing a gray hoodie and blue jeans.

Although at first the caller indicated that "three cars" were involved, *see* Exhibit A at 00:39 & 02:18, she described only two: a dark SUV, either black or blue, and a light sedan, either silver or white. When asked to identify herself, the woman explained that "I'd like to keep the call anonymous." *Id*. at 01:15. However, she had provided the

---

[1] In a subsequent interview with the 911 caller, it was reported she stated the individuals looked like they were "dancing, like they were shooting a music video."

2

building's address and a callback number, and stayed on the line until after police arrived.

### B. Police arrive and immediately detain Mr. Daniels, a Black man standing outside the complex wearing a bright orange jumpsuit.

Officers were dispatched to the apartment complex at approximately 11:35 p.m., and arrived a few minutes later, at approximately 11:39 p.m. There were numerous vehicles in front of the apartment building. Approaching the building by foot, Officer William Idler observed a dark-blue SUV, and provided its license plate to dispatch. *See generally* Exhibit B (Officer Idler body camera footage). He then observed it drive away from the complex. It drove off at a normal rate of speed. Vehicular patrol officers followed the SUV. Officer Idler opted to approach a man standing outside the building's entrance—Mr. Daniels—whom he'd seen talking with occupants of the SUV before it left. Mr. Daniels is Black but looked nothing like the individuals identified by the 911 caller. Officer Idler's report accurately describes Mr. Daniels as being "in the orange wardrobe". *See* Exhibit C (Officer Idler written report). His pants were bright orange; the hoodie on his head was bright orange. Specifically, that night Mr. Daniels was wearing a bright orange, construction-style jumpsuit from head-to-toe, with an unzipped black leather jacket over it. He stood out like a traffic cone:



Officer Idler directed Mr. Daniels to show his hands. With service revolver drawn, the officer ordered him to get down on his knees with his hands above his head. Mr. Daniels complied. As this was happening, another officer, Glen Snow, came over. *See* Exhibit D (Officer Snow body camera footage). Officer Idler began to tell Mr. Daniels that he was detaining him because he appeared to be associated with the SUV that drove off. As he was doing so, another man walked into the scene and interrupted. The man, who was wearing a black hoodie and dark blue jeans, identified himself as Mr. Daniel's brother (and later gave his name, Armand Amber). Mr. Amber began inquiring of officers what was going on, beseeching them to put their guns away. Shortly thereafter, Mr. Amber's girlfriend (wearing a grey hoodie, grey pants, and a black jacket) exited a nearby car and joined the conversation. As Mr. Amber pressed officers about what was going on, Mr. Daniels began to get off his knees, causing Officer Idler to shout at him to get back down on his knees. What ensued thereafter was a confused

exchange between the two officers and three civilians about why Officer Idler was detaining Mr. Daniels.

Officer Idler repeatedly told all three civilians that they were detained, *see e.g.,* Exhibit B at T23:43:06, but upon protestations from the female civilian, he clarified that Mr. Daniels and Mr. Amber were detained, *id*. at T23:12. As pertinent here, during this exchange, Officers Idler and Snow acknowledged that they were on scene because they got a call saying there were people with guns, but repeatedly indicated that they did not suspect Mr. Daniels, Mr. Amber, or his girlfriend of any crime. *See e.g.,* Exhibit D at T23:41:43 ("You guys aren't doing anything bad."), T23:43:55 ("We don't suspect you of any crime."); T23:48:43 ("We don't have anything").

After several minutes of this back-and-forth, an APD Sergeant arrived. In her written report she explained: "At this time, we did not have any evidence of a crime, only a caller stating they saw some people with guns." Exhibit E (report of Sgt. Goodrich). She asked Mr. Daniels and Mr. Amber for their names. At approximately 11:50 p.m., law enforcement ended the detention and let them go on their way. Officers too then left the complex.

As this encounter was unfolding, other APD officers followed the dark SUV seen leaving the apartment complex's parking lot. It drove lawfully, but eventually ran a red light and was pulled over. With guns drawn, officers ordered the vehicle occupants out of the vehicle and to lay on the ground. One occupant of the SUV was wearing a black hoodie and light-colored jeans; the other was wearing a grey hoodie and black pants. With both occupants lying on the ground with guns pointed at them, officers approached them and the SUV. They were handcuffed and placed in squad cars. At 11:51 pm,

officers observed a gun lying on the backseat of the SUV. Officers began searching the vehicle a little after midnight, well after Mr. Daniels' detention had ended.

In the car, officers found four guns. One was a Glock model handgun, found on the rear floorboard behind the passenger seat. It had been reported stolen. Law enforcement seized the stolen Glock. The other three firearms were released at the scene, as neither of the SUV occupants were prohibited from possessing firearms. The two men also were released at the scene, and the driver was given a citation for running the red light and having an open container.

Over two months after officers identified Mr. Daniels by unlawfully detaining him, law enforcement obtained a court order to get his DNA. The affidavit detailed law enforcement's detention of Mr. Daniels on February 7, 2021. *See* Exhibit F. Pursuant to the court order, Mr. Daniels' DNA buccal swabs were collected; they were then submitted to a forensic laboratory. On August 4, 2021, the laboratory provided a report to law enforcement concluding that DNA found on the Glock firearm "is approximately 12,000 times more likely to be observed if it originated from Lyndell Daniels than if it originated from an unknown, unrelated individual." On October 6, 2021, the government indicted Mr. Daniels in this case, alleging that on that February evening he had possessed the Glock firearm found on the back floorboard of the dark SUV.

## ARGUMENT

The Fourth Amendment provides that the "right of the people to be secure in their persons…against unreasonable…seizures, shall not be violated." U.S. Const. amend. IV. A "seizure" occurs when an officer restrains an individual's freedom to walk away. *Terry v. Ohio*, 392 U.S. 1, 16 (1968). Such a seizure is valid only "when the officer has a

reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The government bears the burden of demonstrating that reasonable suspicion exists. *See United States v. White*, 584 F.3d 935, 944 (10th Cir. 2009). Here, officers detained Mr. Daniels almost immediately upon arriving at the scene, demanding, with at least one officer's handgun drawn, that he show his hands and get on his knees, orders with which he complied. *See United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010) (explaining that a Fourth Amendment seizure occurs when an officer shows his authority and the citizen submits to that assertion of authority). This encounter, therefore, was justified only if officers had reasonable suspicion at the time that Mr. Daniels was involved in criminal activity. They did not.

### A. The anonymous 911 call did not provide reasonable suspicion to detain Mr. Daniels.

Here, the 911 call, not reporting any criminal activity, did not provide reasonable suspicion to detain Mr. Daniels. It is true that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Florida v. J.L.*, 529 U.S. 266, 270 (2000). This is not one of those situations.

To the contrary, this case is strikingly similar to *J.L.*, in which a unanimous Supreme Court held officers *lacked* reasonable suspicion to detain the defendant based on a phoned-in tip. *Id*. at 273-74. Specifically, in *J.L.*, an anonymous caller said a Black man wearing a plaid shirt was standing at a bus stop and carrying a gun. *Id.* at 268. When police arrived at the bus stop six minutes later, three Black men were there "hanging out," one of whom was wearing a plaid shirt. *Id.* The police did not see a gun,

7

nor did the men make any threatening or unusual movements. *Id.* Still, the officers told the man in plaid to put his hands up, frisked him, and found a gun. *Id.*

The Court held that the call lacked the requisite indicia of reliability because the tip lacked any predictive qualities and the caller was unknown and unaccountable and did not explain how he knew about the gun or the man. *Id.* at 271. Though, continued the Court, an accurate description of a location and appearance can improve the tip's reliability, the key is whether the tip is "reliable in its assertion of illegality." *Id.* at 272. And on that point, the caller provided officers with nothing to support a detention and frisk. *Id.* at 273-74. In fact, there was no illegality or crime that was reported by the caller.

So too here, where the caller disclaimed any emergency; no crime was being reported. Any assertions of illegality were lacking entirely here, with both the caller and responding officers acknowledging that nothing criminal actually had been observed. Further, there is even less in this case to support reasonable suspicion than there was in *J.L*. In *J.L,* the individual searched matched the description of the 911 caller, wearing a plaid shirt. Not so here. Mr. Daniels did not at all match the description the caller gave, aside from being Black. Finally, as in *J.L.*, the call was made anonymously, with the caller here twice asserting that she wished to remain anonymous.

Additionally, it bears emphasis that, just as in *J.L.*, the fact that the call alleged the presence of firearms is not indicative of criminality. *Id.* at 272-73. *J.L.* itself recognized that "[f]irearms are dangerous," *id*. at 272, yet still found reasonable suspicion to be lacking. Nor are guns inherently illegal. The Supreme Court has recognized that people generally have a constitutional right to carry guns in public, and police may not root

8

reasonable suspicion on that fact, without more. *Id.*; *see also New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* __ S. Ct. __, No. 20-843, 2022 WL 2251305, at *14-15 (U.S. June 23, 2022) (concluding that the plain text of the Second Amendment protects right to carry handguns publicly for self-defense); *compare, e.g.*, *United States v. Conner*, 699 F.3d 1225, 1231 (10th Cir. 2012) (late hour, high-crime area, someone yelling "no, no", defendant's evasive actions, and gun being used to threaten another together established reasonable suspicion).

Here, however, that is all the tip relayed: some men, wearing dark clothing in black or blue pants, were hanging out with guns. The caller herself said it was "not an emergency." This is not a basis for detention, especially of a person wearing bright orange hood and bright orange pants. *See, e.g.*, *United States v. Watson*, 900 F.3d 892, 893-94 (7th Cir. 2018) (finding officers lacked reasonable suspicion to detain based on anonymous 911 call reporting several Black young men by a gray/green car playing with guns and maybe "about to shoot somebody," where officers saw no guns upon arrival, possessing guns is not a crime, and caller was anonymous); *United States v. Ubiles*, 224 F.3d 213 (3d Cir. 2000) (in-person but nameless report of gun at crowded street festival did not provide reasonable suspicion because possessing a gun is not a crime); *United States v. King*, 439 F.Supp.3d 1051 (N.D. Ill. 2020) (anonymous 911 call reporting man firing three shots into intersection did not provide reasonable suspicion as shots were uncorroborated, man matching caller's description did not flee upon contact, and it was not a high-crime area).[2]

---

[2] The Supreme Court's later decision in *Navarette v. California*, 572 U.S. 393 (2014), does not change this conclusion. In *Navarette*, the Court found an anonymous tip to 911 to be sufficient where it reported a specific crime, by a specific vehicle – *i.e.* a silver

9

All told, *J.L.* itself answers the question here—officers did not have reasonable suspicion to detain Mr. Daniels based on the 911 call. But even beyond *J.L.*, one important indicia of reliability the Supreme Court has identified is that a tip may accurately predict "future actions of third parties ordinarily not easily predicted." *Alabama v. White*, 496 U.S. 325, 332 (1990). The implication being that, if a tipster can accurately predict an individual's future behavior, she may have "a special familiarity with [the individual's] affairs" and, in particular, "access to reliable information about that individual's illegal activity." *Id.* No such future prediction or corroboration existed here.

In short, the 911 caller here did not report a crime, link Mr. Daniels to the events she witnessed, or offer a prediction. The caller said it was not an emergency, nor did she say she was affected by a potentially illegal act, or anyone was involved in a potentially illegal act. Officer Snow and Sgt. Goodrich confirmed the report was not of a crime. Likewise, the caller did not describe Mr. Daniels as being one of the men with guns despite his wearing a striking bright orange jumpsuit that night, and there is no evidence to suggest she was familiar with Mr. Daniels. When officers arrived, the only corroborating details were the presence in the parking lot of a dark SUV and light sedan. The individuals and firearms described were not seen.

When compared to *J.L.* and evaluated independently, the 911 call did not furnish either the "sufficient indicia of reliability" or "sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur" necessary to establish

---

pickup truck had run the caller off the road minutes earlier. *Id.* at 399-401. *See also id*. at 403 (finding it significant that the 911 caller reported "a specific and dangerous result"). That is not true here. Here, no emergency or crime was reported, Mr. Daniels did not match the 911 caller's description, and the caller twice requested to remain anonymous, which the operator suggested was ok.

reasonable suspicion to detain Mr. Daniels. *See United States v. Madrid*, 713 F.3d 1251, 1258 (10th Cir. 2013).

### B. Officers did not develop reasonable suspicion at the scene before they detained Mr. Daniels.

Officers needed reasonable suspicion that Mr. Daniels had committed or was committing a crime before detaining him. But in the seconds in which he arrived at the scene before detaining Mr. Daniels, Officer Idler learned nothing that added to the reasonable suspicion calculus.

Walking up to the building, the only thing Officer Idler observed that corroborated the caller's report was a vehicle that roughly corresponded to the 911 caller's description. But no individuals matching that description, let alone anyone showcasing a firearm, were observed. As for Mr. Daniels, Officer Idler simply saw him talking with someone in a dark SUV, which drove away as Officer Idler approached the building. Put simply, arriving to investigate a report about Black men in dark hoodies and jeans holding guns near a dark SUV and light sedan, Officer Idler's first action was to pull his handgun and order a Black man in a bright-orange jumpsuit to get his hands up and body down on the ground. Nothing in the 911 call, or that the officer observed in the seconds before detaining Mr. Daniels, created the requisite reasonable suspicion that Mr. Daniels was engaged in criminal conduct necessary for this action. *See, e.g., J.L.*, 529 U.S. at 268, 272-74.  Even towards the end of the illegal detention, reasonable suspicion was still lacking. As explained by Sgt. Goodrich: "At this time, we did not have any evidence of a crime, only a caller stating they saw some people with guns." Exhibit E.

* * *

All fruits of an illegal seizure must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963). Here, that includes everything officers learned about and from Mr. Daniels during his illegal detention, including all statements made to officers, including his identity and the resultant warrant for a DNA sample that they later obtained using that identification.

## CONCLUSION

Mr. Daniels respectfully requests that the evidence obtained during his illegal seizure be suppressed.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ David E. Johnson
DAVID E. JOHNSON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
David_johnson@fd.org
Attorney for Defendant

CERTIFICATE OF SERVICE

    I hereby certify that on July 18, 2022, I filed the foregoing ***Motion to Suppress*** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail address:

Celeste B. Rangel, Assistant United States Attorney
Email: celeste.rangel@usdoj.gov

    I hereby certify that I have mailed or served the document or paper to the following participant in the manner (mail, hand-delivery, etc.) indicated next to the participant's name:

Lyndel Daniels (via U.S. mail)

                        s/ David E. Johnson
                        DAVID E. JOHNSON
                        Assistant Federal Public Defender
                        633 17th Street, Suite 1000
                        Denver, CO  80202
                        Telephone:  (303) 294-7002
                        FAX:  (303) 294-1192
                        David_johnson@fd.org
                        Attorney for Defendant